# United States Court of Appeals
## For the First Circuit

Nos. 07-1471
     07-1697

UNITED STATES OF AMERICA,

Appellee,

v.

ANGEL GARCÍA-ÁLVAREZ,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. José Antonio Fusté, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella, Circuit Judge,
and Keenan,[*] District Judge.

Joannie Plaza-Martínez, Assistant Federal Public Defender,
with whom Joseph C. Laws, Jr., Federal Public Defender, and
Héctor L. Ramos-Vega, Assistant Federal Public Defender, were on
brief for appellant.
Vernon B. Miles, Assistant United States Attorney, with whom
Rosa E. Rodríquez-Vélez, United States Attorney, Nelson Pérez-Sosa,
Assistant United States Attorney, and Germán A. Rieckehoff,
Assistant United States Attorney, were on brief for appellee.

September 4, 2008

[*] Of the Southern District of New York, sitting by designation.

**TORRUELLA, Circuit Judge**. Following a jury trial, Ángel García-Álvarez ("García") was convicted of carjacking and firearms offenses. Thereafter, the district court denied his motion for new trial, finding that the evidence it was premised on was not newly discovered. García now appeals his conviction on sufficiency and evidentiary grounds, and challenges the denial of his motion for a new trial. Following a careful review, we reject all of García's claims and affirm the district court.

## I. Background

### A. Facts

As García challenges the sufficiency of the evidence proffered against him, we recite the facts in the light most favorable to the verdict. See United States v. Vázquez-Botet, 532 F.3d 37, 42-43 (1st Cir. 2008) (quoting United States v. Colón-Díaz, 521 F.3d 29, 32 (1st Cir. 2008)). On April 12, 2006, around 9:00 a.m., William Ramírez-Resto, a building janitor, was assaulted by at least three armed individuals in the basement of an apartment building in Condado, Puerto Rico. Ramírez-Resto was questioned about the building and its residents, and he was then bound and gagged. At 10:38 a.m., building resident Federico López-Villafañe ("López") was also assaulted in the building's parking lot by four individuals who struck him in the head with rocks and a pistol

butt.[1]  Three of the assailants wore masks, but López testified that these fell off during the ensuing struggle.  López was eventually subdued and forced into the basement where he heard one of the assailants state in Spanish with a Dominican accent: "This motherfucker broke my arm!"  Like Ramírez-Resto, López was also bound and gagged.  The assailants then emptied his pockets and took possession of his house and car keys.  Three of the assailants then left to gain access to López's penthouse apartment.  The fourth assailant remained behind in the basement holding a gun to López's head.

In López's apartment, Clemencia Lewis, a maid, saw a man she did not recognize enter the apartment and head towards the home office; she testified that it was approximately 10:30 a.m.  Lewis was then confronted by a different man armed with a silver-colored gun who, with the help of a third assailant, pushed her into the laundry room,  placed her on the floor, and bound her with an iron cord; her face was covered with a towel.  The assailants then proceeded to rob the home.  They remained in the apartment until approximately 11:20 a.m., when the assailant in the basement became anxious and stepped out to place a call to the men upstairs.  López took this opportunity to escape by running into the street.  Once

---

[1]  We pinpoint this based on a two-minute phone call López received on his cell phone at 10:36 a.m.  He was assaulted immediately after hanging up.

there he saw his car -- a Mercedes Benz -- being driven out of the building's parking lot, apparently by the assailants.

## B. Procedural History

Based on López's identification of him at a police lineup, García was indicted on one count of carjacking resulting in serious bodily injury under 18 U.S.C. § 2119(2), and one count of possession of a firearm in relation to a crime of violence under 18 U.S.C. § 924(c)(1)(A)(ii). He was arraigned one week later, and his trial date was set for August 14, 2006. Shortly before trial, Lewis also identified García from a police photo spread. On August 13, 2006, García moved to have both López's and Lewis's identifications suppressed, but the district court denied this motion during the course of the four-day trial.

At trial, García maintained his innocence and presented an alibi defense. The jury nonetheless found him guilty of the firearms offense and the lesser included offense of simple carjacking. See 18 U.S.C. § 2119(1). García moved for a judgment of acquittal but was denied this on September 12, 2006. On February 13, 2007, the day of his sentencing hearing, García filed a motion for new trial based on newly discovered evidence. The district court sentenced García to a total of 181 months' imprisonment along with a period of supervised release. García timely appealed arguing that the district court erred in admitting López's and Lewis's out-of-court and in-court identifications, and

-4-

in failing to grant judgment of acquittal based on the Government's failure to sufficiently prove the carjacking charge.

On March 30, 2007, the district court also denied García's motion for new trial because the evidence it was premised on was not unknown or unavailable at the time of the trial and could have been discovered with due diligence. García also appeals this denial, and his three claims have been consolidated in this appeal.

## II. Discussion

### A. Suppression Challenge

We review a district court's denial of a suppression motion with deference; such denial will be upheld if any reasonable view of the evidence supports it. See United States v. Brown, 510 F.3d 57, 64 (1st Cir. 2007) (quoting United States v. St. Pierre, 488 F.3d 76, 79 (1st Cir. 2007)). Where, as here, the district court failed to make any specific findings regarding the motion to suppress, we view the record in the light most favorable to the district court's holding and draw all reasonably supported inferences in its favor. United States v. McCarthy, 77 F.3d 522, 525 (1st Cir. 1996) (citations omitted).

An eyewitness identification, such as those of López and Lewis, will be suppressed only upon a double showing: first, that the identification was secured through impermissibly suggestive means; and second, that under the totality of the circumstances the

-5-

suggestiveness of the identification is such that the identification itself is not reliable. <u>United States</u> v. <u>de Jesús-Ríos</u>, 990 F.2d 672, 677 (1st Cir. 1993). Suppression of an identification is only appropriate if we are convinced that there is a "very substantial likelihood of irreparable misidentification." <u>United States</u> v. <u>Pérez-González</u>, 445 F.3d 39, 48 (1st Cir. 2006). García asserts that López's and Lewis's identifications were secured through impermissibly suggestive means and are unreliable to the extent of meeting the <u>de Jesús-Ríos</u> standard.

Immediately following the robbery and carjacking, López provided the police with a description of the four assailants' clothing. He also noted that the assailants spoke Spanish with a Dominican accent. Six weeks after the incident, García voluntarily attended a police lineup where he appeared with five other men. All six men were dressed in orange jumpsuits, and García was made to remove his eyeglasses. When the men were first presented to López, he identified García and stated that he was ninety percent certain that García was one of the assailants who had assaulted and robbed him. Upon request, the six men then repeated in Spanish the statement made by one of the assailants during the robbery: "This motherfucker broke my arm!" Upon hearing this phrase, López identified García with complete certainty.

García argues that López's lineup identification of him was impermissibly suggestive for three reasons: first, because García alleges that he only became a suspect due to his family connection to two other men suspected in the crime; second, because he was made to remove his eyeglasses even though -- as his optometrist later certified -- he is legally blind without them; and third, because he was made to repeat the assailant's statement even though he was the only man on the panel who spoke Spanish with a Dominican accent.

García's first claim is quickly dismissed. García's initial identification as a suspect, even if it resulted from his family connection to two other wanted men, is not an impermissibly suggestive procedure affecting López's lineup identification. López was unaware of the circumstances under which García became a suspect. As López was not privy to this information, there is no way such knowledge could have influenced or colored his identification of García.

The removal of García's eyeglasses was similarly not suggestive. García's second claim here is peculiar in that most identification challenges we and our sister circuits encounter involve the presence of a distinguishing characteristic that stands out during the identification process. See, e.g., Monteiro v. Pickard, 443 F.2d 311, 312 (1st Cir. 1971) (appellant challenged the suggestiveness of his lineup identification where he was the

only man wearing civilian clothing while the rest of the panel wore prison garb); United States v. Traeger, 289 F.3d 461, 474 (7th Cir. 2002) (appellant challenged the suggestiveness of his lineup identification because -- at six and a half feet and weighing over 300 pounds -- he was the largest man on the panel); United States v. Triplett, 104 F.3d 1074, 1080 n.2 (8th Cir. 1997) (appellant challenged the suggestiveness of the lineup identification during which he wore a brightly colored but "surprisingly tasteful, Hawaiian-type shirt"). In these cases, appellants usually argue that they have been wronged because the composition of their lineup was in some way not uniform. García's claim, then, is the converse in that, if he had been allowed to wear his eyeglasses when the rest of his panel did not wear any, he would have stood out. The removal of García's eyeglasses as well as the use of the orange jumpsuits were intended to preserve the integrity of the police lineup and advance the goal of uniformity. As such, the removal of the eyeglasses was not an impermissibly suggestive procedure.[2]

García's third challenge, however, requires a closer look. As a starting point, making the lineup panel repeat the assailant's statement was not an impermissibly suggestive identification procedure. See United States v. Panico, 435 F.3d

_____

[2]  In as far as García's argument is that, due to his eye condition, he always wears glasses and would thus have worn them during the robbery and carjacking, the jury already considered and rejected this argument. We see no need to upset the jury's determination.

47, 49 (1st Cir. 2006) ("Lay witness identification, based on the witness' prior familiarity with a voice, is a commonplace way in which voices are identified."); Fed. R. Evid. 901(b)(5); 5 Christopher B. Mueller & Laird C. Kirkpatrick Federal Evidence § 9:13 (3d ed. 2008). The allegation that García was the only man on the panel who spoke Spanish with a Dominican accent, however, is troubling because the Dominican accent then became a distinguishing characteristic that detracted from panel uniformity. Furthermore, since López's description of the assailants to the police highlighted their Dominican accents, that García was the only panel participant who possessed this salient characteristic turned the entire identification proceeding unduly suggestive. Cf. Frazier v. New York, 156 F. App'x 423, 425 (2d Cir. 2005) (finding suggestive a lineup identification where appellant was the only person with dreadlocks, where dreadlocks were the most distinctive feature of the crime victim's description of her assailant).

A suggestive identification may nonetheless remain in evidence if, given the totality of the evidence, it is reliable. De Jesús-Ríos, 990 F.2d at 677. In determining whether there was a substantial likelihood of irreparable misidentification we evaluate some or all of five factors: (1) the witness's opportunity to view the criminal at the time of the crime, (2) the witness's degree of attention at that time, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty

demonstrated by the victim at the time of the identification, and (5) the length of time between the crime and the identification. Id. (quoting United States v. Drougas, 748 F.2d 8, 27 (1st Cir. 1984)); accord Neil v. Biggers, 409 U.S. 188, 199-200 (1972).

Of these five factors, two clearly support reliability in this case. Given the traumatic nature of the robbery and carjacking, we assume López's degree of attention during the incident to have been high. See Levasseur v. Pepe, 70 F.3d 187, 195 (1st Cir. 1995). In addition, López himself stated that he was ninety, and later, one hundred percent certain of his identification of García at the time of the police lineup. The remaining three factors, however, are either neutral or weigh against reliability. López's opportunity to view his assailants during the criminal incident, though ample due to the hours-long duration of the crime, was hampered by the assailants' intermittent use of masks and blindfolds. López's initial description of the assailants did not include any identifying physical characteristics, and six weeks elapsed between the robbery and carjacking and the police lineup. See United States v. Guzmán-Rivera, 990 F.2d 681, 683 (1st Cir. 1993) (counting as factors detracting from the reliability of an identification the fact that the crime victim had not provided the authorities with a description of the assailant and had made his final identification one month after the crime); but see United States v. Mohammed, 27

-10-

F.3d 815, 822 (2d Cir. 1994) ("[T]he absence of a prior description by the witness does not necessarily render his or her subsequent identification suspect." (internal quotation marks omitted)).

Nonetheless, given the totality of the circumstances, we cannot say that the fact that García was the only one in the lineup who spoke with a Dominican accent produced a "very substantial likelihood of irreparable misidentification." Pérez-González, 445 F.3d at 48. We are not required to accord each factor equal weight or even to consider all five factors. See, e.g., United States v. Gatewood, 230 F.3d 186, 193 (6th Cir. 2000) (considering only two factors); United States v. Johnson, 56 F.3d 947, 954 (8th Cir. 1995) (considering only three factors); United States v. Butler, 970 F.2d 1017, 1021 (2d Cir. 1992) (considering only four factors). In this case, the fact that López was able to identify García with a very high degree of certainty before García was even asked to speak at the lineup weighs heavily in favor of reliability. Cf. United States v. Wilkerson, 84 F.3d 692, 695-96 (4th Cir. 1996) (placing particular emphasis on the certainty with which multiple witnesses identified the defendant). As such, the district court did not err in admitting López's out-of-court identification into evidence.[3]

---

[3] We see no evidence that the unduly suggestive procedure in any way tainted the in-court identification or made it unreliable. See United States v. Maguire, 918 F.2d 254, 264 (1st Cir. 1990) (stating that an in-court identification is generally admissible unless it is based on an out-of-court identification that was both

-11-

García's challenge to Lewis's out-of-court and in-court identifications is far less developed. One week before García's trial was to begin, an FBI agent visited Lewis at her place of work and showed her a photo spread containing six pictures, one of which was of García. Lewis initially picked a different man from the photo spread, but indicated that she was uncertain. Lewis then stated that the man who had assaulted her was tall and had a dark complexion and a very pointy chin. She subsequently picked García's photograph. García does not flag any of the procedures utilized during this identification as impermissibly suggestive; and therefore his claim fails. See de Jesús-Ríos, 990 F.2d at 677.[4] The district court properly denied García's motion to suppress.

## B. Sufficiency Challenge

We review a sufficiency of the evidence claim de novo, "evaluating whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Meléndez-Torres, 420 F.3d 45, 48-49 (1st Cir. 2005) (quoting United States v. Grace, 367 F.3d 29, 34 (1st Cir 2004)). We also review de novo a district court's denial of a

suggestive and unreliable).

[4] As the out-of-court photo spread identification was proper, Lewis's in-court identification was proper as well. See id.

-12-

motion for acquittal, "examining the evidence . . . in the light most favorable to the government to determine whether a reasonable jury could find guilt beyond a reasonable doubt." United States v. Rodríguez-Durán, 507 F.3d 749, 758 (1st Cir. 2007).

It is the Government's duty to prove all the elements of a charged crime. For carjacking under 18 U.S.C. § 2119(1) those elements are: (1) taking or attempted taking from the person or presence of another; (2) a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce; (3) through the use of force, violence, or intimidation; (4) with the intent to cause death or serious bodily harm. See 18 U.S.C. § 2119(1). García argues that the Government has not met its burden of establishing the intent element beyond a reasonable doubt because López's assailants did not intend to take his car but only to rob his home. The car was only an improvised getaway vehicle.

García's argument is unavailing. In carjacking offenses, the element of intent must be established at the time the defendant takes control of the motor vehicle. United States v. Evans-García, 322 F.3d 110, 114 (1st Cir. 2003) (quoting Holloway v. United States, 526 U.S. 1, 8 (1999)). At the time of such taking, the victim need not be in close proximity to the motor vehicle. See United States v. Vega Molina, 407 F.3d 511, 528 (1st Cir. 2005). In García's case, the "taking" of the motor vehicle occurred in the apartment building's basement, when López was forced to turn over

-13-

his car keys. It was at that point that the assailants gained constructive control over López's car. See id.; accord United States v. Savarese, 385 F.3d 15, 20 (1st Cir. 2004).

The intent required at the time of the vehicle taking, however, need not be set in stone. It will suffice that a defendant had a conditional intent to cause death or serious bodily harm; that is, a willingness to cause such injury if necessary to take the vehicle. Evans-García, 322 F.3d at 114 (citing Holloway, 526 U.S. at 11-12). Such conditional intent is more than amply established in this case by the fact that the assailants did, from their initial contact with López, use force and inflict serious physical harm upon him. Such force involved the use of guns, and it was only upon being threatened with further violence and even death that López surrendered his car keys. As the assailants' violent assault left López bleeding and requiring medical care and even surgery, it is beyond question that the assailants possessed the requisite intent to cause death or serious bodily harm.

Finally, and in direct response to García's "getaway vehicle" argument, we have previously said that "nothing in the statute requires that the taking [of a motor vehicle] be an ultimate motive of the crime." United States v. Rivera-Figueroa, 149 F.3d 1, 4 (1st Cir. 1998). "It is enough that the defendant be aware that the action in which he is engaged . . . involves the taking of a motor vehicle." Id. In this case, the Government

-14-

presented evidence that García was both present and active in López's assault, and that he later rode away from the robbery scene in López's Mercedes, which was started with the car keys López was forced to surrender. Based on this evidence, García could not but be aware that he was involved in the taking of a motor vehicle, and the intent requirement of the carjacking offense is resoundingly met. The Government has thus satisfied its burden of proving each element of the carjacking offense beyond a reasonable doubt. The district court correctly denied García's motion for judgment of acquittal.

### C. Motion for New Trial

The remedy of a new trial is to be granted sparingly and only to avoid a miscarriage of justice. United States v. Conley, 249 F.3d 38, 45 (1st Cir. 2001). We recognize that trial judges are in the best position to determine whether a new trial based on newly discovered evidence is warranted, and we thus review any such determination only for abuse of discretion. See United States v. Montilla-Rivera, 171 F.3d 37, 40 (1st Cir. 1999) (quoting United States v. Tibolt, 72 F.3d 965, 972 (1st Cir. 1995)). Nevertheless, the district court's analysis and our review are also guided by the principle that a new trial should be granted "if the interest of justice so requires." Fed. R. Crim. P. 33(a); see also United States v. Rodríguez-Marrero, 390 F.3d 1, 13-14 (1st Cir. 2004).

In order to reverse a district court's denial of a motion for new trial based on newly discovered evidence, the defendant carries the heavy burden of showing that the new evidence submitted was: (1) unknown or unavailable at the time of trial; (2) despite due diligence; (3) material; (4) and likely to result in an acquittal upon retrial. United States v. Falú-González, 205 F.3d 436, 442 (1st Cir. 2000) (quoting United States v. Montilla-Rivera, 115 F.3d 1060, 1064-65 (1st Cir. 1997)). García asserts that the evidence grounding his motion for new trial meets this high standard. Such evidence consists of a report and hearing testimony from Centennial cell phone company engineers stating that all cell phone calls made from García's phone on the morning of the crime were placed from the municipality of Carolina and not from the crime scene in Condado ("cell site evidence").[5] García submits this evidence as probative of the alibi defense he presented at trial.[6]

---

[5]  The district court took judicial notice of the fact that the municipalities of San Juan -- where Condado is located -- and Carolina border each other, and are geographically close.

[6]  At trial, García argued that at the time of the charged crimes he was working on his side business delivering furniture in the municipality of Carolina. In this endeavor he was accompanied by his employee Juan Espaillat, who submitted an unsworn statement in García's favor. According to both men, on the morning in question they met at about 9:00 a.m. at the American Furniture store in Carolina. García advised Espaillat that he needed to go pay his cell phone bill before making the delivery, and Espaillat loaded the furniture into a white box truck by himself. When he was done, Espaillat spoke to García on his cell phone and set out to make the furniture delivery at about 10:30 a.m. According to Espaillat,

According to the Centennial engineers, the cell site evidence demonstrates that, on the morning of the robbery and carjacking, all calls made by García's cell phone were handled by cell sites within the municipality of Carolina and along the purported delivery route. Based on this finding, the engineers assert that it is almost certain that García's calls were placed from Carolina. This is because cell phone calls are usually handled by the cell site closest to where the cell phone is located; only rarely are phone calls referred to a cell site that is farther away.[7]

On appeal, the Government does not dispute the engineers' testimony, but argues that the cell site evidence does not entitle García to a new trial because it is not newly discovered as required by Federal Rule of Criminal Procedure 33. Moreover, even if the evidence is accepted as true, it only shows that García's cell phone was in Carolina, not that García himself was there. With these arguments in mind, we proceed to our analysis.

---

after conversing with García a few more times to get directions, he arrived at the delivery residence at approximately 11:00 a.m. García arrived in his gray Toyota Tundra pickup truck five minutes later. With both men's efforts, the delivery of the furniture was finished around noon.

[7] Indeed, to ascertain the rate of call referrals within the Condado area, the engineers carried out an experiment where they placed one hundred cell phone calls during the span of one hour while situated at the scene of the robbery. All one hundred of those calls were handled by the same cell site in Condado, and none was handled by a cell site in Carolina. Thus, according to the engineers, the rate of call referral in Condado is extremely low.

Falú-González asks whether the new evidence "could have been discovered with due diligence and was thus not 'new'" at the time of trial. Id. at 443. It is undisputed that defense counsel was in possession of García's cell phone records before the start of trial. On those records, each phone call has a billing code (e.g., "9E," "VP," "P2") listed to its right and a legend at the bottom of the page that matched each code to a general geographic area (e.g., "9E - San Fernando," "VP - Villa Palmeras," "P2 - Puerto Nuevo"). The call records did not indicate the significance of these billing codes nor did they suggest that Centennial had the capability to further delineate the geographical provenance of each call to almost street level. Both parties accept that defense counsel did not learn of the possibility of such specific call triangulation until after the jury's verdict, and that Centennial only generated the cell site evidence upon the defense's post-judgement request.

Nonetheless, the trial judge did not abuse his discretion in finding that this evidence could have been discovered with due diligence and was thus not new. We understand due diligence to be "a context-specific concept" generally akin to the degree of diligence a reasonably prudent person would exercise in tending to important affairs. United States v. Maldonado-Rivera, 489 F.3d 60, 69 (1st Cir. 2007). As stated above, García's counsel did not know -- and did not endeavor to learn prior to trial -- that through

-18-

cell site location Centennial would be able to pinpoint the provenance of the calls made from García's and Espaillat's cell phones to nearly street level. Defense counsel also admit that they were so certain of García's innocence that they made the tactical decision to rely solely on the strength of their other alibi evidence.

García's counsel made a conscious decision to go to trial using the evidence they had available. Counsel's work log further indicates that counsel did not inquire about the billing codes on García's call records until more than two months after the jury had entered its guilty verdict. That being the case, even if it is true that the development and production of the cell site evidence was so complex and time-consuming that it took two and a half months to complete -- and hence could not have been achieved in the three weeks between the district court's initial status conference and the beginning of García's trial -- García cannot now establish his counsel's due diligence. Defense counsel did not do anything before or during trial to secure the post-judgment evidence upon which García's motion for new trial is premised. Rule 33 does not give counsel a second opportunity to rectify a faulty trial strategy. As such, García's motion for new trial was properly denied.

García may choose to raise by collateral attack under 28 U.S.C. § 2255 the issue of whether his counsel's performance

-19-

amounted to ineffective assistance of counsel.  See <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668 (1984).  If so, it is likely that evidence will have to be taken on a number of points, which are beyond the scope of this opinion.

### III. <u>Conclusion</u>

For the foregoing reasons, we affirm the district court's judgment and denial of new trial.

**<u>Affirmed</u>**.