# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————

No. 13-30827

———————

BLUEBONNET HOTEL VENTURES, L.L.C.,

Plaintiff—Appellant

v.

WELLS FARGO BANK, N.A.,

Defendant—Appellee

United States Court of Appeals
Fifth Circuit

**FILED**
June 6, 2014

Lyle W. Cayce
Clerk

———————

Appeal from the United States District Court
for the Middle District of Louisiana

———————

Before REAVLEY, JONES, and GRAVES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This appeal arises from the district court's grant of summary judgment for Appellee Wells Fargo Bank, N.A. ("Wells Fargo") on Appellant Bluebonnet Hotel Ventures' ("Bluebonnet") claim for rescission of contract. For the following reasons, we affirm.

## BACKGROUND

Bluebonnet is a single-purpose corporate entity that was established to construct and operate a hotel in Baton Rouge, Louisiana. In order to finance the hotel's construction, Bluebonnet obtained an allocation of tax-exempt Gulf Opportunity Zone bonds, which Bluebonnet intended to sell to investors. In

No. 13-30827

late 2006, Bluebonnet contacted Wells Fargo[1] to provide a letter of credit for the bonds and underwrite their sale. In March 2007, the parties agreed upon and executed a term sheet outlining the terms for a proposed letter of credit. Among other things, the term sheet specifically provided: "This letter is not a commitment or agreement to lend money or extend credit[.]" Subsequent negotiations between the parties regarding the letter of credit eventually broke down, and ultimately Wells Fargo did not finance the bonds. Bluebonnet instead closed on a $2.5 million letter of credit with Regions Bank in order to meet state deadlines and preserve its bond allocation. Bluebonnet was only able to issue $2.5 million of its bond allocation, and those bonds were never sold to the public.

Meanwhile, shortly before the execution of the term sheet, Wells Fargo asked Bluebonnet whether it would be interested in entering into a swap agreement, which would reduce the risk associated with floating interest rates on the bonds that Bluebonnet planned to sell. As described by the lower court, a swap agreement

> is a separate agreement whereby parties agree upon a fixed, baseline interest rate (usually including a certain spread above the market interest rate), and one party makes payment to the other based on whether the floating market interest rate (usually a specified interest rate index) moves above or below the fixed interest rate. The payments are calculated based on the difference between the fixed and floating interest rates over a given interval, multiplied by a hypothetical amount of "notional" principal agreed to in advance.

*Bluebonnet Hotel Ventures, L.L.C. v. Wachovia Bank, N.A.*, No. 3:10-cv-00489-JJB-RLB (M.D. La. Sept. 29, 2011) (order granting in part and denying in part

---

[1] Bluebonnet originally dealt with Wachovia Bank rather than Wells Fargo, but the two banks merged during the pendency of the negotiations. The parties agreed to substitute Wells Fargo for Wachovia in this suit.

motion to dismiss).   Under the agreement, the parties' payments would theoretically offset each other as the variable interest rate on the bonds fluctuated, resulting in Bluebonnet's ultimately paying a fixed interest rate on the bonds.   While the parties were in negotiations over the agreement, Wells Fargo sent Bluebonnet a presentation on how the swap transaction would work, which included the following disclaimer:

> Although this proposal describes how the customer could use the proposed transaction to hedge against the interest expense of an existing or future loan or other financing, the proposed transaction would be a separate and independent obligation of the customer and would not be contingent on whether [such financing closes, is outstanding, or is repaid].

Despite the fact that the bonds had yet to be issued, and a letter of credit had yet to be executed, Bluebonnet entered into the swap agreement with Wells Fargo.

In the summer of 2007, after the swap agreement was executed but before its effective date, interest rates rose above the fixed rate, such that Bluebonnet could have terminated the agreement and received in excess of $1 million from Wells Fargo.  Bluebonnet was informed of this option but chose not to terminate the swap agreement at that time.  Shortly thereafter, in 2008 interest rates dropped to historic lows, and Bluebonnet was required to pay Wells Fargo the difference in interest rates.  Bluebonnet asserts that this has resulted in over $6 million in payments to Wells Fargo under the swap agreement.

Bluebonnet subsequently filed suit against Wells Fargo, seeking to rescind the swap agreement based on failure of cause, negligence and detrimental reliance under Louisiana law.  Wells Fargo filed a motion to dismiss, which the district court granted in part, allowing Bluebonnet's failure

No. 13-30827

of cause claim to proceed.[2]  After discovery, Wells Fargo moved for summary judgment on Bluebonnet's failure of cause claim.  When the district court granted this dispositive motion, timely appeal followed.

## STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed *de novo*. *DePree v. Saunders*, 588 F.3d 282, 286 (5th Cir. 2009).  This court applies the same standards as the district court, *id.*, granting summary judgment where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Crawford v. Formosa Plastics Corp., La.*, 234 F.3d 899, 902 (5th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  The court is to consider evidence in the record in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  *Thorson v. Epps*, 701 F.3d 444, 445 (5th Cir. 2012).  However, the non-movant must go beyond the pleadings and present specific facts indicating a genuine issue for trial in order to avoid summary judgment.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."  *Id.* at 322.  An appellate court may affirm summary judgment "on any ground supported by the record, even if it is different from that relied on by the district court." *Holtzclaw v. DSC Commc'ns Corp.*, 225 F.3d 254, 258 (5th Cir. 2001).

---

[2] The district court also allowed Bluebonnet's detrimental reliance claim to proceed and ultimately granted summary judgment to Wells Fargo on that claim.  Bluebonnet does not appeal that ruling.

No. 13-30827

## DISCUSSION

Under Louisiana law, "[a] contract is formed by the consent of the parties[.]" La. Civ. Code art. 1927. However, a party's consent may be vitiated by, and a contract rescinded upon, error. La. Civ. Code art. 1948. "Error vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party." La. Civ. Code art. 1949. In other words,

> [E]rror is a ground for invalidation when it bears on a circumstance that determined the will of the party in error as the principal reason for which that party consented to obligate himself. It is required, however, that the other party knew, or should have known, that that circumstance was such a reason for the party in error.
>
> Saul Litvinoff, *Vices of Consent, Error, Fraud, Duress and an Epilogue on Lesion*, 50 La. L. Rev. 1, 25 (1989). Louisiana jurisprudence recognizes that once a party in error demonstrates a "failure of cause," the contract may be rescinded. *Angelo & Son, LLC v. Piazza*, 1 So.3d 705, 710 (La. Ct. App. 2008).

Bluebonnet insists that there is a failure of cause warranting rescission of the swap agreement. Bluebonnet maintains that its cause for entering into the agreement was to "fix the rate" on variable rate bonds, contingent on Wells Fargo issuing a letter of credit for the bonds, and that cause allegedly failed when Bluebonnet was unable to obtain a letter of credit from any financial institution that would finalize the bond financing.

Contrary to Bluebonnet's assertions, the contractual language of the swap agreement undercuts Bluebonnet's argument with regard to the letter of credit. The agreement specifically obliged Bluebonnet to pay Wells Fargo any unfavorable difference between the fixed interest rate amount and the floating interest rate amount as such payments became due, *irrespective* of whether "there exists at any time a commitment for any [f]inancing" or "circumstances change such that [Bluebonnet] . . . is unable to obtain[] any financing"

5

No. 13-30827

(alterations added).[3] The agreement defined "financing" as "any loan or other extension of credit" that Bluebonnet received from Wells Fargo or any other entity. Moreover, in executing the swap agreement, Bluebonnet affirmed that the agreement created an obligation that was "separate and apart" from any existing or future loan or financing, and that Bluebonnet's obligations under the agreement would "not be contingent on whether any loan or other financing closes, is outstanding or is repaid."

It is evident from the express terms of the agreement that finalizing financing for the bonds was not Bluebonnet's cause for entering into the agreement, and Bluebonnet has not highlighted any contractual language that clearly suggests otherwise.[4] Bluebonnet acknowledges, and the swap agreement confirms, that Bluebonnet entered into the swap agreement in order to receive the difference between the floating and fixed interest rates in the event that the floating rate exceeded the fixed rate. Bluebonnet has never alleged that this cause failed. Therefore, Bluebonnet has not demonstrated a genuine factual issue as to whether there is an error vitiating its consent to the swap agreement and warranting rescission.[5]

---

[3] Bluebonnet's manager, Milford Wampold, signed seven different confirmations between May 1, 2007—shortly after the swap agreement was executed—and May 2, 2008, each of which reiterates these provisions verbatim.

[4] In an effort to demonstrate that Bluebonnet's cause for executing the swap agreement hinged on a forthcoming letter of credit, Bluebonnet cites to emails that were exchanged with Wells Fargo around the time that the swap agreement was signed. However, under Louisiana law, courts may only consider parol evidence when a contract is ambiguous. *See* La. Civ. Code art. 2046. Bluebonnet does not allege, nor do we find, that the swap agreement is ambiguous. *See Campbell v. Melton*, 817 So.2d 69, 75 (La. 2002) ("A contract is considered ambiguous on the issue of intent when either it lacks a provision bearing on that issue, the terms of a written contract are susceptible to more than one interpretation, there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed."). We do not consider the parol evidence that Bluebonnet presents.

[5] Bluebonnet urges this court to affirm that Louisiana law permits a contract to be rescinded when a cause that was based on the anticipation of a *future* event or condition fails due to the non-occurrence of the event or condition. *Compare Angelo & Son, LLC v. Piazza*,

No. 13-30827

This conclusion is supported by our previous decision, *Dameware Development, L.L.C. v. American General Life Insurance. Co.*, in which this court held that there was no failure of cause constituting error or warranting rescission of a contract. 688 F.3d 203, 208-09 (5th Cir. 2012). The plaintiff in *Dameware* maintained that its cause for entering into contract with the defendant was to obtain tax benefits for certain employees' life insurance policies. *Id.* at 207. That cause purportedly failed when the plaintiff was unable to obtain the benefits. *Id.* Upon review of the parties' agreement, however, this court reasoned that the contract focused almost entirely on insurance policies, not tax benefits, while the one form that did discuss tax benefits disclaimed the defendant's responsibility for them. *Id.* Looking to the plain language of the contract, this court concluded that the plaintiff's cause for entering into the contract was to secure life insurance policies, not tax benefits, and because that cause had not failed, the contract could not be rescinded. *Id.* at 207-08. *See also In re Merrill Lynch Auction Rate Sec. Lit.*, No. 09 MD 2030(LAP), 2010 WL 1924719 at *7 (S.D.N.Y. May 11, 2010) (applying Louisiana law and dismissing a failure of cause claim where the "alleged cause . . . was explicitly contradicted by the terms of the Commitment Letters").

Based on the foregoing analysis, the judgment of the district court is AFFIRMED.

---

1 So. 3d 705, 709-10 (La. Ct. App. 2008), *Carpenter v. Williams*, 428 So. 2d 1314, 1318 (La. Ct. App. 1983), *and O'Neal v. Cascio*, 324 So. 2d 539, 541-42 (La. Ct. App. 1975) *with St. Charles Ventures, L.L.C. v. Albertsons, Inc.*, 265 F. Supp. 2d 682, 688-95 (E.D. La. 2003) *and Hanover Petroleum Corp. v. Tenneco, Inc.*, 521 So. 2d 1234, 1240-41 (La. Ct. App. 1988). Given our conclusion as to Bluebonnet's cause for entering into the agreement, we need not address that issue here.