# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

No. 14-20202

————

United States Court of Appeals
Fifth Circuit

**FILED**

August 28, 2015

Lyle W. Cayce
Clerk

DAVID MONTANO, Individually And On Behalf Of Other Employees Similarly Situated,

      Plaintiff - Appellant

v.

MONTROSE RESTAURANT ASSOCIATES, INCORPORATED, doing business as Restaurant Associates Payroll, also known as Tony's, also known as Tony's Restaurant,

      Defendant - Appellee

_____

GASTON NIEVES

      Plaintiff - Appellant

v.

MONTROSE RESTAURANT ASSOCIATES, INCORPORATED, doing business as Restaurant Associates Payroll, also known as Tony's, also known as Tony's Restaurant,

      Defendant - Appellee

————

Appeal from the United States District Court
for the Southern District of Texas

————

No. 14-20202

Before DENNIS, PRADO, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

This case concerns coffee and tipping. Two waiters sued the Houston restaurant where they worked, claiming the restaurant violated federal law by requiring them to share tips with the restaurant's "coffeeman." The district court granted the restaurant's motion for summary judgment, holding that, as a matter of law, the coffeeman was an employee who customarily and regularly received tips. Because there is a genuine issue of material fact as to whether the coffeeman customarily and regularly received tips, we REVERSE.

## BACKGROUND

Plaintiffs-Appellants David Montano and Gaston Nieves worked as waiters for Tony's, a fine-dining restaurant in Houston. Tony's divided its dining room into various "stations," each consisting of several tables. Each station's tables were serviced by a "captain," or lead waiter, and additional "waiters, busboys, and other service personnel." At the end of each shift, the tips left on a station's tables were divided, as directed by Tony's, among the captain, front waiter, back waiter, busboy, bartender, and coffeeman. All participants in the tip pool received a percentage of the station's tips except for the coffeeman, who received a fixed ten dollars from each station each shift. In addition to their tips, the plaintiffs were paid $2.13 per hour by Tony's.

On January 17, 2012, Montano sued Tony's, claiming that by requiring him to share his tips with the coffeeman, who they claim worked in the kitchen and did not serve customers, the restaurant violated the Fair Labor Standards Act ("FLSA").[1] Tony's moved for summary judgment, arguing that it complied with the FLSA provision that permitted "the pooling of tips among employees

---

[1] On October 19, 2012, Nieves sued the restaurant, alleging the same FLSA violations. Both complaints are styled as "collective action" complaints on behalf of similarly situated Tony's waiters. The district court consolidated the cases.

who customarily and regularly receive tips" and that the coffeeman could be included in such a tip pool because his "primary duties entail important customer service functions." The plaintiffs opposed, arguing that the coffeeman did not receive tips directly from customers and did not service, or even interact with, the customers. The district court granted summary judgment for the restaurant. *Montano v. Montrose Rest. Assocs., Inc.*, No. H-12-153, 2014 WL 7529628 (S.D. Tex. Feb. 4, 2014). The court reasoned:

> For a worker to be eligible for tip sharing, his work must be important for direct diner service. . . . The barista directly supports the waiters [by making coffee and related concoctions]. He is an aide, not a remote coworker like a janitor or cook. Prompt, skillful preparation of these drinks produces diner satisfaction. . . . Tony's may require its waiters to share their tips with [the barista].

*Id.* at *1–2. Plaintiffs timely appealed.

## DISCUSSION

### I.

We review a district court's grant of summary judgment *de novo*, applying the same standard as the district court. *Bluebonnet Hotel Ventures, L.L.C. v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 275 (5th Cir. 2014). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Bluebonnet*, 754 F.3d at 276 (citations and internal quotation marks omitted). We "consider evidence in the record in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party." *Id.*

No. 14-20202

The FLSA sets the general national minimum wage at $7.25 per hour. 29 U.S.C. § 206(a)(1).[2]    The FLSA contains an exception that permits employers to pay less than the general minimum wage—$2.13 per hour—to a "tipped employee" as long as the employee's tips make up the difference between the $2.13 minimum wage and the general minimum wage.  29 U.S.C. § 203(m); *see also Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872, 874 (8th Cir. 2011). This employer discount is commonly referred to as a "tip credit."  *See Fast*, 638 F.3d at 874.

A restaurant may not claim a tip credit unless "all tips received by [a tipped] employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips."  29 U.S.C. § 203(m). Thus, the general rule is that an employer may not claim the tip credit unless a tipped employee is permitted to retain all of his tips.  *See id.*[3]  The statute provides a limited exception to this rule by permitting "the pooling of tips among employees who customarily and regularly receive tips."  *Id.*   If an employee is required to share tips with an employee who does not customarily and regularly receive tips, the employer may not legally take a tip credit.[4]

The primary issue in this case is whether Tony's properly claimed the "tip credit" and paid Appellants less than the general minimum wage.  There

---

[2] Between July 24, 2008 and July 23, 2009, the minimum wage was $6.55 per hour. 29 U.S.C. § 206(a)(1).  Although the change in the minimum wage could be relevant for damages, it does not affect our analysis.

[3] The FLSA also requires an employer taking a tip credit to inform its employees about any tip pooling arrangement.  *See* 29 U.S.C. § 203(m).  The issue of notice is not on appeal.

[4] This complicated statutory structure is the result of this country's unique and durable tradition of tipping.  *See* Yoram Margalioth, *The Case Against Tipping*, 9 U. Pa. J. Lab. & Emp. L. 117, 121 (2006) ("[T]ipping has become quintessentially American.").

is no dispute that Appellants, as waiters, are "tipped employees."[5]  There is also no dispute that Appellants did not retain all of their tips; Tony's required them to pool and share with other waiters, busboys, a bartender, and the coffeeman.  Appellants do not challenge the requirement that they share tips with other waiters, busboys, or the bartender.  Therefore, the narrow issue is whether the coffeeman was an employee who "customarily and regularly receive[d] tips."  29 U.S.C. § 203(m).  If the answer is yes, Tony's prevails.  If the answer is no, Tony's violated the FLSA by failing to pay Appellants $7.25 per hour.[6]  Tony's has the burden of establishing its entitlement to the tip credit.  *See Roussell v. Brinker Int'l, Inc.*, 441 F. App'x 222, 230 (5th Cir. 2011) (holding that a restaurant "had the burden to prove it operated a legal tip pool"); *see also Myers v. Copper Cellar Corp.*, 192 F.3d 546, 549 n.4 (6th Cir. 1999) ("[A]n employer who invokes a statutory exemption from minimum wage liability bears the burden of proving its qualification for that exemption."); S. Rep. No. 93-690, at 43 (1974) ("[T]he original intent of Congress [is] to place on the employer the burden of proving . . . the amount of tip credit, if any, which such employer is entitled to claim . . . .").

## II.

It is not easy to determine whether the Tony's coffeeman customarily and regularly received tips.  The obvious starting point, of course, would be to inquire whether he actually received tips.  Here, however, it is of no moment

---

[5] The FLSA defines "[t]ipped employee" as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips."  29 U.S.C. § 203(t).

[6] *See* U.S. Dep't of Labor, Wage and Hour Div., Fact Sheet #15: Tipped Employees Under the Fair Labor Standards Act (FLSA) (rev. July 2013), *available at* http://www.dol.gov/whd/regs/compliance/whdfs15.pdf (last visited July 23, 2015) ("Where a tipped employee is required to contribute to a tip pool that includes employees who do not customarily and regularly receive tips, the employee is owed all tips he or she contributed to the pool and the full $7.25 minimum wage.").

that the coffeeman actually received tips because he received tips exclusively through an employer-mandated tip pool. It would be circular to find that, because Tony's required waiters to give the coffeeman tips, the coffeeman customarily and regularly received tips. This would allow a restaurant to designate any employee it wished as a tipped employee and claim a tip credit, as long as it made that employee part of a mandatory tip pool and the waiter's retained tips plus the waiter's $2.13 salary exceeded the general minimum wage. To give meaning to the statute, the question must be whether the coffeeman would customarily and regularly receive tips if waiters were not required to include him in the tip pool.[7] *See* 29 U.S.C. § 203(m). Unfortunately, the record contains no information about the but-for world; Tony's longstanding practice was to require waiters to include the coffeeman in their tip pools.

Determining whether the coffeeman would receive tips in the absence of Tony's policy requiring them to share in the tip pool is particularly difficult because restaurant patrons typically do not specify a recipient for their tips. A "tip" within the meaning of the FLSA is defined as "a sum presented by a customer as a gift or gratuity in recognition of some service performed for him. . . . Whether a tip is to be given, and its amount, are matters determined solely by the customer, who has the right to determine who shall be the recipient of the gratuity." 29 C.F.R. § 531.52; *see also United States v. Conforte*, 624 F.2d 869, 874 (9th Cir. 1980) (defining a "tip" as "a voluntary payment in

---

[7] The FLSA does not require that an employee who customarily and regularly receives tips receive them directly from customers. *See Kilgore v. Outback Steakhouse of Fl., Inc.*, 160 F.3d 294, 301 (6th Cir. 1998) (citing U.S. Dep't of Labor Field Operations Handbook § 30d04(a) ("It is not required that all employees who share in tips must themselves receive tips from customers.")). For example, if waiters *voluntarily* and customarily shared tips with the coffeeman, the coffeeman could be an employee who customarily and regularly received tips.

an amount, and to a person, designated by the customer"). Unlike tips that are given directly to a recipient—e.g., a parking attendant or bellhop—restaurant tips are left on the table, and are usually "undesignated." *See Austin v. Colonia Wiliamsburg Hotel Props., Inc.*, No. 4:95CV130, 1996 WL 406671, at \*1 (E.D. Va. June 14, 1996) ("The tips which are left after a meal are ordinarily undesignated. That is, the customer will ordinarily leave one tip and not designate to whom any portion of the tip should be given."). Even without direct evidence of the intended recipients of the tips, we can employ several tools to infer who the recipients are.

We first consider U.S. Department of Labor ("DOL") rules and guidance. The DOL is authorized to promulgate rules interpreting and clarifying the FLSA. *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 165 (2007) (explaining that the Secretary of Labor is authorized "to prescribe necessary rules, regulations, and orders with regard to the amendments made by this Act") (quoting Pub. L. No. 93-259, § 29(B), 88 Stat. 55 (1974)). The DOL's Wage and Hour Division has interpreted the FLSA and its tip credit provisions in administrative materials. *See* 29 U.S.C. § 259; *see also* Updating Regulations Issued Under the Fair Labor Standards Act, 76 Fed. Reg. 18832-01, 18839 (Apr. 5, 2011) ("Wage and Hour has interpreted the tip pooling clause more fully in opinion letters and in its Field Operations Handbook . . . ."). These materials can help give meaning to ambiguous statutory and regulatory phrases like "customarily and regularly receive tips."[8]

The DOL has provided examples of occupations that "customarily and regularly receive tips" and those that do not. Its Field Operations Handbook

---

[8] For example, in interpreting an ambiguous regulatory phrase, the Eighth Circuit afforded *Auer* deference to the DOL's interpretation that an employee must spend 20 percent of his time engaged in tip-producing activities to be considered a "tipped employee." *Fast*, 638 F.3d at 876–81 (citing *Auer v. Robbins*, 519 U.S. 452 (1997)).

("Handbook") lists "waiters/waitresses"; "bellhops"; "counter personnel who serve customers"; "busboys/girls (server helpers)"; and "service bartenders" as tipped occupations and "[j]anitors"; "[d]ishwashers"; "[c]hefs or cooks"; and "[l]aundry room attendants" as non-tipped occupations.  U.S. Dep't of Labor, Field Operations Handbook § 30d04(a), (c) (1988).[9]  A coffeeman is not on either list and, more critically, the Handbook provides no explanation why the selected employees fall into one or the other category.  *See* Neil Patrick McConnell, Comment, *Mr. Pink Never Leaves a Tip: How Current Tip Credit and Tip Pool Guidelines Leave Employees at the Mercy of Employers*, 114 Penn St. L. Rev. 621, 632 (2009) (noting that the Handbook's listings do not "explain[] the employee characteristics which qualify or disqualify particular types of employees from being able to participate in the tip pool").

The DOL also has issued opinion letters responding to inquiries about whether certain employees qualify as tipped employees under the FLSA.  The opinion letters make clear that one's status as an employee who "customarily and regularly receives tips" is "determined on the basis of his or her activities," not on the employee's job title.  U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 1997 WL 998047, at *2 (Nov. 4, 1997); *see also* 29 C.F.R. § 531.56 (recognizing that some employees have dual jobs and an employee is only a "tipped employee" when engaged in that job in which he is tipped).[10]  For

---

[9] These categories correlate directly with those contemplated by Congress when it first promulgated Section 203(m) in 1974.  *See* S. Rep 93-690, at 43 (categorizing "waiters, bellhops, waitresses, countermen, busboys, service bartenders, etc" as employees who customarily and regularly receive tips and "janitors, dishwashers, chefs, laundry room attendants, etc" as employees who do not).

[10] Indeed, in one opinion letter, the DOL opined on whether a restaurant's dishwashers qualified as tipped employees.  U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 1997 WL 998047 (Nov. 4, 1997).  If the DOL deferred to job title, it need not have issued a detailed opinion, because "dishwasher" is listed in the Handbook as an example of an employee that does not customarily and regularly receive tips.  Handbook § 30d04(c).  Instead, the DOL carefully assessed the subject dishwashers' stated job duties.

example, chefs are one of the classic examples of those with whom tipped employees cannot be required to share tips. *See* Handbook § 30d04(c) (listing chefs or cooks, along with janitors, dishwashers, and laundry room attendants as occupations not eligible to participate in a tip pool). But *sushi* chefs who work at a counter in the dining room and directly serve customers may participate in tip pools. *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 2008 WL 5483058, at *1 (Dec. 19, 2008). This case highlights the shortcoming of attempting to classify based on job title rather than the employee's duties. The coffeeman is varyingly referred to in the record as "coffeeman"; "kitchen barista"; "food runner/barista"; "barista"; and "Kitchen Coffee Man". Appellants themselves used "kitchen barista" in the original Montano complaint, but "Kitchen Coffee Man" in the later Nieves complaint. Labels are easily molded to fit a party's goals and cannot be determinative of whether an employee customarily and regularly receives tips.

While the opinion letters, like the Handbook, do not address the coffeeman occupation, they provide some insight into the DOL's view of when an employee customarily and regularly receives tips. The DOL has advised that itamae-sushi and teppanyaki chefs who prepare and serve meals directly to customers are tipped employees because they provide customer service similar to counter persons. *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 2008 WL 5483058, at *1 (Dec. 19, 2008). Barbacks who assist bartenders, primarily work in front of and around customers, and have the opportunity to occasionally interact with customers are tipped employees because they are similar to busboys. *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 2009 WL 649014, at *1–2 (Jan. 15, 2009). On the other hand, a dishwasher who occasionally responds to customer requests and has minimal presence in the dining room setting up glasses likely is not a tipped employee. *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 1997

WL 998047, at *1–2 (Nov. 4, 1997).  With this guidance in mind, we turn to how courts have determined which employees customarily and regularly receive tips.

## III.

Courts faced with this question have analyzed the employee's job duties to determine whether he was tipped or not.  In one frequently cited case, the Sixth Circuit determined that restaurant hosts and hostesses were engaged in an occupation in which they customarily and regularly received tips because they had "more than de minimis interaction with the customers" in an industry in which "undesignated tips are common."  *Kilgore v. Outback Steakhouse of Fl., Inc.*, 160 F.3d 294, 301 (6th Cir. 1998).  The Sixth Circuit considered hosts' interaction with restaurant patrons to be a good proxy for whether diners intended them to receive tips.   Because tipping is a "gratuity in recognition of some service performed," 29 C.F.R. § 531.52, the fact that hosts "perform[ed] important customer service functions" in front of the customers meant that hosts qualified as "tipped employees."  *See Kilgore*, 160 F.3d at 301–02.  The court in *Kilgore* used these principles to distinguish hosts—who greeted customers, supplied them with menus, sat them at tables, and occasionally "enhanced the wait" by treating waiting customers to complimentary drinks or appetizers—from dishwashers, cooks, or off-hour employees like a janitor— who did not directly interact with the customers at all.  *Id.* at 301.

Subsequently, the Sixth Circuit held that salad preparers, who "abstained from any direct intercourse with diners, worked entirely outside the view of restaurant patrons, and solely performed duties traditionally classified as food preparation or kitchen support work," could not be categorized as

No. 14-20202

"tipped employees." *Myers*, 192 F.3d at 550.[11]    The court required the restaurant to pay waiters the general minimum wage for shifts in which salad preparers were improperly included in the tip pool. *See id.* at 550–51.

In an unpublished decision, this court reviewed a jury's finding that "Quality Assurance" workers did not work in a position "that customarily and regularly receive[d] tips." *Roussell*, 441 F. App'x at 225, 231. The workers inspected completed food orders from the kitchen, garnished plates, and delegated to servers and bussers the delivery of food to customers. *Id.* at 225. Employing a standard deferential to the jury's verdict on review of the denial of a judgment as a matter of law, we found that the jury could have found that Quality Assurance workers did not customarily and regularly receive tips. *See id.* at 229–30. We drew a distinction between front-of-the-house staff (who customarily receive tips) and back-of-the-house staff (who do not) and held that direct customer interaction was "highly relevant" to tip eligibility. *Id.* at 231. We declined to adopt the restaurant's proposed rule that "employees who perform important customer service functions are eligible to share tips regardless of whether they have direct customer interaction or not." *Id.*

The common thread of the cases and the DOL opinion letters is to require a tipped employee to have more than a de minimis interaction with the customers who leave the undesignated tips.[12] We agree with these persuasive

---

[11] The court found it irrelevant that the "salad preparers" were waiters who were assigned to prepare salads for certain shifts. *See Myers*, 192 F.3d at 548, 550–51. What mattered was their job duties during the shifts in question, not their titles. *See id.*

[12] Lower courts too have consistently focused on the extent of customer interaction when determining whether an employee is customarily and regularly tipped. *See Rubio v. Fuji Sushi & Teppani, Inc.*, No. 6:11-cv-1753, 2013 WL 230216, at *3 (M.D. Fla. Jan. 22, 2013) (kitchen chefs were not tipped employees because they did not have "more than minimal customer interaction"); *Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 89 (E.D.N.Y. 2012) (a waitress could not be required to share tips with a chef "who had no direct interaction with customers"); *Pedigo v. Austin Rumba, Inc.*, 722 F. Supp. 2d 714, 732 (W.D. Tex. 2010) (granting summary judgment to plaintiff because dishwashers who occasionally shucked oysters and peeled shrimp did not "have more than minimal customer interaction").

authorities and hold that, in determining whether an employee customarily and regularly receives tips, a court—or a factfinder—must consider the extent of an employee's customer interaction. This rule is faithful to the goal of the inquiry: determining the customer's intent. A customer is more likely to tip someone with whom he has contact, or at least sees assisting in the service.[13] A court or factfinder should also consider whether the employee is engaging in customer service functions. Even an employee who works in the dining room will not be considered a tipped employee if his work is not customer service-oriented, for example, an electrician who is repairing a chandelier for the restaurant.

The district court erred in failing to consider the extent of the coffeeman's customer interaction in determining whether he customarily and regularly received tips. The district court found that the coffeeman "directly aid[s] in serving diners" and that his work is "important for direct diner service." *Montano*, 2014 WL 7529628, at *1. While this may be true, the district court's test does not adequately distinguish those employees traditionally considered to be tipped from those considered to be non-tipped. *See* Handbook § 30d04. Many traditionally non-tipped employees aid waiters and are important for direct diner service. Indeed, it is difficult to imagine more important contributions to diner satisfaction than providing a meal (a chef) and clean silverware with which to eat it (a dishwasher). To customarily and regularly receive tips requires more. The central difference between employees who are traditionally tipped and those who are not is that the former work primarily in the front of the house where they are seen by and interact with customers, while the latter work primarily or exclusively in the back of the house. *See*

---

[13] It is not clear that Tony's diners are even aware there is a designated employee to make coffee drinks, while they are likely aware that waiters, busboys, and bartenders are contributing directly to their enjoyment.

*Roussell*, 441 F. App'x at 231 ("Customarily, front-of-the-house staff like servers and bartenders receive tips.  Back-of-the-house staff like cooks and dishwashers do not, and thus cannot participate in a mandatory tip pool.").[14]

## IV.

Applying this standard, there is a genuine issue of material fact as to whether the coffeeman was eligible to participate in a mandatory tip pool.  Critically, there is a genuine issue of fact about whether the coffeeman had *any* interaction with the diners who left the tips.  The evidence on summary judgment divides the relevant time period in half.  Before June 2011, taking the facts in the light most favorable to Appellants, as we must, the coffeeman never went into the dining room, never brought trays to and from the dining room, did not wear a uniform, and only made coffee and tea.  Starting sometime in the summer of 2011, the coffeeman's job responsibilities expanded, though the extent of the expansion is disputed.  Taking the facts in the light most favorable to Appellants, the coffeeman began wearing a uniform and carried large trays to the dining room about once per week.  Even after this small change in job responsibilities, the coffeeman spent "most" of his time in the

---

[14] The district court's decision—and Tony's argument—analogizes the coffeeman and a service bartender.  *See Montano*, 2014 WL 7529628, at *1; Handbook § 30d04(a).  This analogy crucially relies on a premise that is not supported by the record or by supporting legal materials: that a service bartender, as the Department of Labor uses the term, "works out of sight."  *Montano*, 2014 WL 7529628, at *1.  In fact, a service bartender, within the meaning of the FLSA, is likely a front-of-the-house employee who works in plain view of customers.  *See Elkins v. Showcase, Inc.*, 704 P.2d 977, 989 (Kan. 1985) (characterizing a bartender located behind a wall, with no customer contact, as a "nonservice" bartender for purposes of the FLSA).  Authority cited by Tony's defines "service bartender" as it is used in the tax, not labor, context, and, in any event, does not support the conclusion that a service bartender works out of sight.  *See Krause v. Comm'r*, 63 T.C.M. (CCH) 2968 (1992) ("A service bartender works behind the bar *in the game or slot machine area* and fills orders taken by the cocktail servers, but has no direct contact with the public." (emphasis added)).  Classifying a service bartender as a front-of-the-house employee, albeit one that may not always directly interact with customers, is consistent with how courts and the DOL have distinguished employees who do and do not customarily and regularly receive tips.

kitchen making coffee.  At all relevant times, the coffeeman did not take customer orders, did not pour water or arrange water glasses, and did not help prepare the bread.[15]  Viewing the evidence in the light most favorable to Appellants, the coffeeman had no customer interaction until the summer of 2011, and only de minimis interaction (one occasion per week) thereafter. From a station in the kitchen, the coffeeman received orders from waiters and provided waiters drinks to give to customers.  From this evidence, a factfinder could find that the coffeeman did not customarily and regularly receive tips.

## CONCLUSION

Determining whether an employee is one who "customarily and regularly receives tips" is a fact-intensive inquiry that requires a case-by-case analysis of the employee's duties and activities.  There is evidence from which a factfinder could conclude that the coffeeman's level of customer interaction in a customer service role was non-existent or minor enough such that he is more similar to a cook or a dishwasher than he is to a waiter or a busboy.  For these reasons, we REVERSE the district court's grant of summary judgment and REMAND to the district court for proceedings consistent with this opinion.[16]

---

[15] Tony's submitted evidence that the coffeeman helps bring food to the dining room 20-25 times per shift (more on weekends), assists with bringing bread to tables, and must wear a busboy uniform so he looks presentable to customers.  The affidavit is dated May 7, 2012, and it is unclear if the description refers to the current job duties only or as they existed before the summer of 2011.  In any event, because these facts are directly disputed, we ignore them for purposes of summary judgment. *See Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982) (in assessing whether summary judgment is appropriate, "[a]ll reasonable doubts about the facts should be resolved in favor of the non-moving litigant").

[16] Because we reverse the grant of summary judgment, we need not reach Appellants' alternative argument that the district court should have permitted additional pre-summary judgment discovery.

No. 14-20202

JAMES L. DENNIS, Circuit Judge, concurring in the judgment:

The question in this case is how to distinguish those employees who "customarily and regularly receive tips," 29 U.S.C. § 203(m), from those who do not. Given the prevalence of undesignated tips—*i.e.*, those left without express instructions as to who are the intended recipients—the question has attendant difficulties. I agree with much of the majority's analysis of the issue.[1] Respectfully, however, I write separately to explain certain problematic aspects of its analysis and to provide additional, hopefully helpful, guidance for future cases in this area.[2]

The majority sets the following rule: "[I]n determining whether an employee customarily and regularly receives tips, a court—or a factfinder— must consider the extent of an employee's customer interaction." *Ante*, at 12. In so considering, the majority instructs courts and factfinders to adopt the following (hopefully rebuttable) presumption: "A customer is more likely to tip

---

[1] I will note my agreement with two of the majority's most important points. First, I agree that an employee cannot be deemed to "customarily and regularly receive tips" merely because of a mandatory policy requiring that other workers share their tips with him. *Ante*, at 5-6. To hold otherwise would indeed "be circular." *Id*. at 6. Second, I agree that the employee's job title is not controlling. *Id*. at 8-9.

[2] The difficulties attendant in determining which employees "customarily and regularly receive tips" are manifest in the disarray of analytic approaches courts have taken to resolve the question. E.g., does an employee "receive tips" merely because the employer has a mandatory policy that requires other employees to share tips with him? *Compare Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d 294, 301 (6th Cir. 1998) (yes), *with, e.g., Chan v. Triple 8 Palace, Inc.*, No. 1:03-CV-6048, 2006 WL 851749, at *14 n.22 (S.D.N.Y. Mar. 30, 2006) (no). In determining whether an employee "customarily and regularly receives tips," does the inquiry turn on the employee's individual duties or the profession to which the employee belongs? *Compare Kilgore*, 160 F.3d at 301 (the latter, essentially), *with Pedigo v. Austin Rumba, Inc.*, 722 F. Supp. 2d 714, 730 (W.D. Tex. 2010) (the former). Must the employee interact with customers? *Compare Ford v. Lehigh Valley Rest. Grp., Inc.*, No. 3:14-CV-227, 2014 WL 3385128, at *4 (M.D. Pa. July 9, 2014) (yes), *with Lentz v. Spanky's Rest. II, Inc.*, 491 F. Supp. 2d 663, 671 n.5 (N.D. Tex. 2007) (no). The question presented in this case quite plainly is in need of a clear answer.

15

someone with whom he has contact . . . ." *Id.* This is probably a helpful rule of thumb for most cases but, respectfully, I think that it will lead the court or factfinder astray in others. For example, hotel guests rarely interact with the housekeeping staff but nevertheless often leave tips for them.[3] Conversely, a restaurant's owner or manager might spend much of the evening asking customers how their meals were, but customers never tip him for his interaction. A nightclub's bouncer may have to "interact" (a clear understatement) with customers, and yet it's virtually unknown for anybody to tip him after picking themselves up off the pavement.[4] In each of these examples, contrary to the majority's assumption, there is clearly no correlation between the amount of customer interaction and the likelihood of a tip.

Next, the majority sets this rule: "A court or factfinder should also consider whether the employee is engaging in customer service functions. . . ." *Id.* The problem here is that it is unclear what exactly the majority has in mind when it refers to "customer service." For example, I think most people would consider grocery store cashiers as providing "customer service," and yet in my experience people only rarely, if ever, tip them.[5]

---

[3] Marnie Hunter, *Hotel Housekeeping: Do You Tip?*, CNN (Aug. 24, 2011), http://www.cnn.com/2011/TRAVEL/06/24/hotel.housekeeping.tipping/ ("Survey data shows that about 30% of U.S. hotel guests leave tips for hotel housekeepers . . . .").

[4] I borrowed this clever example from *Wajcman v. Investment Corporation of Palm Beach*, No. 9:07-CV-80912, 2008 WL 783741, at *4 (S.D. Fla. Mar. 20, 2008) (observing that, "[w]hile the [bouncer's] job might entail significant customer interface, it does not involve the exchange of pleasantries or provision of personal services that ordinarily evokes tipping generosity"). *See also Stewart v. CUS Nashville, LLC*, No. 3:11-CV-342, 2011 WL 2600622, at *3 n.2 (M.D. Tenn. June 29, 2011) ("[T]he court is not convinced that a bouncer who had largely unpleasant, confrontational, or hostile interactions with customers would be eligible for a tip pool.").

[5] *See, e.g.*, Amy Dickinson, *No Taste for Rehash at Thanksgiving*, Chicago Tribune (Nov. 14, 2009), http://articles.chicagotribune.com/2009-11-14/news/0911130331_1_girl friend-brother-dinner ("It's as absurd as tipping the grocery cashier!").

Thus, in determining which employees "customarily and regularly receive tips," the majority's presumptions about "customer interaction" and "customer service" may be helpful in some circumstances, with respect to some jobs—indeed, I think they are helpful guideposts in this case involving a fine-dining restaurant and its "coffeeman"—but will inevitably prove counterproductive in others, such as those I have outlined. As I read the majority's opinion, it does not disagree. *Cf. ante*, at 14 ("Determining whether an employee is one who 'customarily and regularly receives tips' is a fact-intensive inquiry that requires a case-by-case analysis of the employee's duties and activities."). In future cases in which "customer interaction" and "customer service" prove to be false indicators of the receipt of tips, courts should understand the limited nature of the majority's guidance here, which was crafted with a particular fine-dining restaurant and one of its employees in mind, and not feel obliged by today's decision to adopt presumptions that conflict with the factual reality in the case at hand. *Cf. Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 466 (1992) ("[P]resumptions that [do not] rest on . . . actual . . . realities are generally disfavored . . . .").

How, then, should future courts separate those employees who "customarily and regularly receive tips" from those who do not? What is needed is a neutral analysis, applicable in all circumstances, that is consonant with our country's many peculiar norms and practices of tipping as they vary from one position or business to another. Put another way, courts need an analytical framework that can be applied in all cases to reach rational results. *See* Herbert Wechsler, *Toward Neutral Principles of Constitutional Law*, 73 HARV. L. REV. 1, 15 (1959) ("[T]he judicial process . . . must be genuinely principled, resting . . . on analysis and reasons quite transcending the immediate result that is achieved. To be sure, the courts decide, or should

decide, only the case they have before them. But must they not decide on grounds of adequate neutrality and generality . . . ?"). The relevant regulations and persuasive case law provide the following:

*First*, and of principal importance, is the precise meaning of "tips." "A tip is a sum presented by a customer as a gift or gratuity in recognition of some service performed for him. . . . Whether a tip is to be given, and its amount, are matters determined *solely by the customer, who has the right to determine who shall be the recipient of the gratuity*." 29 C.F.R. § 531.52 (emphasis added). Therefore, the central focus of the inquiry into whether an employee "customarily and regularly receive tips" must be, *who do the customers intend to receive their tips*? *Accord ante*, at 12 ("[T]the goal of the inquiry [is] determining the customer's intent."); *see also Wajcman v. Inv. Corp. of Palm Beach*, No. 9:07-CV-80912, 2009 WL 465071, at *4 (S.D. Fla. Feb. 23, 2009) ("Indeed, the federal regulations, as well as the legislative history of the statute itself, indicate that it is the *customer's* expectation and intent that provides the basis for determining who qualifies as a 'tipped employee.'"). Of course, a customer may intend for more than one person to receive the tip. For example, after movers finish unloading furniture into a new home, the customer may hand cash to one member of the crew with the expectation that it will be shared with the others. Likewise, a restaurant patron may leave cash on the table with the expectation that the waiter, who is most likely to pick it up, will share it with the bartender who prepared the patron's cocktail or the busboy who cleaned the table.

*Second*, "customarily." Customs are "habitual or usual practice[s]; common way[s] of acting." Oxford English Dictionary (online ed.), *available at* http://www.oed.com (last visited Aug. 27, 2015); *see also* Merriam-Webster Dictionary (online ed.), *available at* http://www.merriam-webster.com (last

visited Aug. 27, 2015) (defining customs as, *inter alia*, "practice[s] common to many or to a particular place or class . . ."). Thus, the question becomes: Is there a habitual and usual practice among the business's customers to tip—*i.e.*, to present money with the intent that it be received by—the position of the employee at issue in the case?

*Third*, "regularly." For an employee to "regularly" receive tips, the employee at issue must in fact receive tips with a frequency that is "greater than occasional, but . . . may be less than constant." *See* 29 C.F.R. § 531.57. Here, the focus is not on the customer but rather on the employee and whether that employee actually receives tips with sufficient frequency.

There is overlap between "customarily" and "regularly" receiving tips, but the concepts are distinct. *See Ford v. Lehigh Valley Rest. Grp., Inc.*, No. 3:14-CV-227, 2014 WL 3385128, at \*3 (M.D. Pa. July 9, 2014) ("[T]he adverbs 'customarily' and 'regularly' are stated in the conjunctive rather than the disjunctive. As such, the FLSA's plain meaning requires employees to customarily *and* regularly receive tips to be included in the tip pool."). For example, there may be a "custom" of tipping a moving crew upon completion of a move, but if every move requires on average, say, a week on the road, and there is downtime between moves, then the crew members probably do not "regularly" receive tips.

To summarize, when a court must determine whether a particular employee "customarily and regularly receives tips" under 29 U.S.C. § 203(m), the inquiry should be, essentially: At the specific business involved in the case, do the customers, as a habitual and usual practice (*i.e.*, customarily), present money with the intent that the employee in question receive it as a gift or gratuity in recognition of a service the employee performed (*i.e.*, as a tip for

No. 14-20202

that employee), and does the employee in fact regularly receive such tips?  If so, then that employee "customarily and regularly receives tips."

The issue of customer intent is necessarily a highly fact-bound inquiry that requires drawing reasonable inferences from the available concrete but circumstantial evidence.  *Cf., e.g., United States v. Trejo*, 610 F.3d 308, 315 (5th Cir. 2010); *United States v. Paul*, 274 F.3d 155, 162 (5th Cir. 2001).  When intent is unclear—as it likely will often be, given our nation's peculiar tipping norms—courts can draw inferences from common experience; for example, the court may presume that it is unusual for restaurant patrons to tip the chef. But because the court's job is to assess reality, not dictate it, such assumptions must never override the concrete evidence; a tip jar with a "for the chef" label indicates tips for the chef no matter how uncommon a court may think such tips are.  *Cf. Parham v. J.R.*, 442 U.S. 584, 602 (1979) ("As with so many other legal presumptions, experience and reality may rebut what the law accepts as a starting point . . . .").[6]

Applying the foregoing analysis to the facts of this case, I agree with the majority that there is a genuine dispute as to whether the coffeeman at Tony's restaurant in Houston, who prepares coffee in the kitchen, outside the view of the customers, "customarily and regularly receives tips."  It is reasonable to infer that the restaurant's customers, who are probably wholly unaware of the

---

[6] Of course, the manner in which the court assesses the evidence and draws its inferences of customer intent will vary in different procedural postures.  This case came before the court on the motion of Tony's restaurant for summary judgment.  On such a motion for summary judgment, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Therefore, we must infer, if the evidence allows it when viewed in the light most favorable to the plaintiffs, that customers do not intend for the restaurant's "coffeeman" to receive their tips.

coffeeman's existence, most likely intend to tip their waiter or the bartender, if anyone, for the preparation of their coffee, but not the coffeeman.

Accordingly, with these additional thoughts, I respectfully concur in the majority's judgment that the restaurant is not entitled to summary judgment on the record presented for our review.